UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

TOMMY SICKELS,                          )
              Plaintiff,                )
                                        )
    vs.                                 )
                                        )        1:10-cv-00479-SEB-DKL
CENTRAL NINE CAREER CENTER,             )
              Defendant.                )

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**


Presently before the Court is the Motion for Summary Judgment [Docket No. 39] filed by Defendant, Central Nine Career Center ("Central Nine"), on July 15, 2011, pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1.  Plaintiff, Tommy Sickels, brings this claim against Central Nine, his former employer, for its allegedly discriminatory actions towards him based on his disability or perceived disability, in violation of the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. § 12101 *et seq.*, as amended by the ADA Amendments Act of 2008 (ADAAA).  He also asserts claims against Central Nine for allegedly retaliating against him for engaging in protected activity, all in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"), and also in violation of the anti-retaliation provisions of the Family and Medical Leave Act (FMLA), 29 U.S.C. § 2617, and the ADA.  For the reasons detailed in this entry, we GRANT Defendant's Motion for Summary Judgment on all of Plaintiff's claims.

**Factual Background**

Mr. Sickels is a veteran police officer who has devoted over twenty-seven years to the Indianapolis Metropolitan Police Department. He holds a master's degree and a certificate in public management, and he has completed coursework toward a Ph.D. Def.'s Mot. for S.J. at 2. He has also spent part of his career teaching college level law enforcement classes. By the end of 2007, he aspired to transition from police work to a full-time teaching position. *Id.*

Central Nine is a public career and technical school that offers vocational classes at the high school and college levels. The school's main campus is located in Greenwood, Indiana, and the school is affiliated with several high schools in Johnson and Marion Counties. Def.'s Mot. for S.J. at 2. Among Central Nine's many courses of study is one in public safety, which includes law enforcement classes. Central Nine advertised an opening for a law enforcement instructor position—presumably in 2007—and ultimately filled the position by hiring Mr. Sickels. *Id.*

In June of 2007, two months prior to his start date at Central Nine, Mr. Sickels suffered a stroke while he was out of town in Atlanta, Georgia. Soon afterward, while he was still in Atlanta, he received a phone call from Central Nine principal John Strader, who wanted to schedule a CPR class to be taught by Mr. Sickels. During the call, Mr. Sickels informed Mr. Strader of his stroke and suggested that, in light of this event, Mr. Strader might wish to hire another instructor; nevertheless, Mr. Strader elected to continue Mr. Sickels's employment. Def.'s Mot. for S.J. at 2. Mr. Sickels subsequently

returned to Indianapolis and completed in-patient rehabilitation from June 19 through August 5, 2007. *Id.* at 3. Following therapy, he has continued to experience pain, strength limitations, and neuropathy.

Mr. Sickels began his teaching duties at Central Nine in August of 2007. During the first two weeks he was on the job, he requested and received a wheelchair to use for traveling long distances around the campus during the day. Thereafter, he was able to walk with the assistance of a cane for the ensuing six months. Def.'s Mot. for S.J. at 3-4; Def.'s Ex. 40 at 73-74. At the beginning of his tenure at Central Nine, the school also provided Mr. Sickels with a part-time instructional assistant who distributed papers and helped with grading. Mr. Sickels enjoyed having an instructional assistant, but he did not request an extension of these services after this individual stopped coming to his classroom in October. *Id.* at 3. Mr. Sickels enlisted his girlfriend and some of his students when he required assistance with class errands or challenging physical maneuvers. *Id.* at 4. He summarizes the start of his employment as follows: "things were pretty much on the up-and-up . . . [e]verything was okay"; "Strader was approachable"; and "Craw . . . was . . . approachable." Def.'s Ex. 40 at 87.

Regrettably, Mr. Sickels's "honeymoon phase" at Central Nine was short-lived, as he apparently soon grew dismayed at the disrespectful behavior of some of his students. In November of 2007, he became the subject of an investigation after an anonymous caller reported to school administrators that Mr. Sickels was dating one of his female high school students. Def.'s Mot. for S.J. at 4. Mr. Sickels admitted to Central Nine director

Tim Lavery and assistant principal Jeanette Craw that he had lent a female student his car and allowed her to sit at his desk to grade papers, but he denied that they had ever dated. Mr. Strader investigated the matter and concluded that although the conduct which Mr. Sickels had admitted "was not good judgment," the accusation of an affair could not be substantiated.[1]  According to Mr. Sickels, Mr. Strader did not treat him badly in the wake of this incident.  *Id.* at 6.  By contrast, Mr. Sickels doubted that Ms. Craw believed his side of the story.  *Id.* at 4-5.

During Mr. Sickels's employment, it was Central Nine's practice to evaluate "non-permanent" instructors such as he once per semester.  Ms. Craw first evaluated Mr. Sickels on November 13, 2007 and noted that, *inter alia*, he did not directly engage his students in class activities for sufficient periods of time.  She also observed some students eating, reading magazines, using electronic devices, and sitting at Mr. Sickels's desk during class periods.   By Mr. Sickels's estimation, Ms. Craw gave him a "bad evaluation because she suspected he dated [the female student]."  Def.'s Mot. for S.J. at 5.  Mr. Sickels discussed the evaluation with Ms. Craw and claims that after this discussion, she "treated [him] as if he did not exist."  *Id.* at 6.  Beyond the evaluation, the only noteworthy incident occurring in Mr. Sickels's classroom involved a student who broke

---

[1]In February of 2008, Mr. Strader, Mr. Lavery, and Central Nine's curriculum director received phone calls from an individual claiming to be able to verify an affair between Mr. Sickels and the female student.  Mr. Strader investigated again and still could not substantiate the caller's allegations.  When he spoke to Mr. Sickels and Ms. Craw on February 14, 2008 about these allegations, Mr. Sickels accused both administrators of harassment.  Def.'s Mot. for S.J. at 5; *see also* Pl.'s Ex. 11 at 166-67.

his leg during a guest lecturer's demonstration and later filed a lawsuit against the school. *Id.*

Mr. Sickels's conduct again presented cause for concern at Central Nine sometime near the start of 2008, when he reportedly told some of his students that he suspected the school of "trying to build a case to fire him." Def.'s Mot. for S.J. at 6. Mr. Strader became aware of these comments by Mr. Sickels when, during a five-day period of absence at the end of January 2008,[2] Mr. Strader was informed of students voicing—some to Ms. Craw—their concern "that if [Mr. Sickels] was not there the next day, he had quit." *Id.* Mr. Strader was also informed that Mr. Sickels had made his computer password[3] and classroom key available to a particular student. While Mr. Sickels was away, another student asked to withdraw from his class because "the class was not learning," and his substitute teacher found prescription pills in Mr. Sickels's unlocked desk. *Id.* at 7.

Upon Mr. Sickels's return to Central Nine following his leave, he learned that students had spoken to Ms. Craw about him and that Ms. Craw "was asking students to . . . make statements against him." Def.'s Mot. for S.J. at 7. Mr. Sickels then contacted a state teachers' union representative. Central Nine administrators thereafter determined that Mr. Strader, rather than Ms. Craw, would handle any issues related to Mr. Sickels.

---

[2]Mr. Sickels was in a car accident on January 28, 2008 and was subsequently absent from his teaching job for five days. We assume from the briefing that the reason for this absence was the car accident.

[3]Mr. Sickels disputes this allegation.

Thus, Mr. Strader fielded a written complaint[4] from a student about Mr. Sickels during the spring 2008 semester. Mr. Strader also completed Mr. Sickels's routine spring evaluation in April of 2008, assigning Mr. Sickels a "needs improvement" rating in the areas of "maintaining an effective learning environment, time management, and organizing physical space for safety and quality instruction." *Id.* at 8. Based on these ratings, he also prescribed a Performance Improvement Plan for Mr. Sickels's teaching.[5] Mr. Sickels signed the evaluation form on April 10, 2008 without disputing any of its contents, but he "[thought] he told Strader . . . that he was going to file an EEOC charge against Craw." *Id.* He did, in fact, file an EEOC charge later that month alleging age and sex discrimination in Ms. Craw's 2007 performance evaluation of him. *Id.* at 9. The dispute was mediated on June 5, 2008, the result of which was that in exchange for a meeting with Ms. Craw and Dr. Stephen Hagen, who had earlier that year become Central Nine's new director, Mr. Sickels withdrew the EEOC charge. *Id.* at 10.

The 2008-09 academic year brought a new set of challenges for Mr. Sickels at Central Nine. At the start of the fall 2008 semester, Central Nine began requiring its instructors to park near the main campus building. Mr. Sickels asked to continue parking behind the building where his classroom was located because of his mobility issues, and

---

[4]According to the student, Mr. Sickels was sometimes "half asleep" while teaching and gave too much control to students.

[5]As part of this plan, Mr. Sickels was included in Central Nine's new teachers' forum during his second year and encouraged to observe law enforcement programs at other area schools. Def.'s Mot. for S.J. at 16.

he was permitted to do so.[6]  Def.'s Mot. for S.J. at 10-11.  More classroom-related

challenges soon followed:  (1) a notification that students had inappropriately left class

early; (2) staff complaints that his students were "changing down to their underwear in

the hall" before physical training (PT); and (3) advice from Mr. Strader that it was

"inappropriate" to allow students to play football during PT class.  *Id.* at 11-12.  Mr.

Sickels and Mr. Strader had a September 16 conference discussing these problems, the

result of which was a written reprimand in the form of a letter from Mr. Strader, who

wrote, *inter alia*:  "With the verbal statements from adult staff members and also

watching video from our security system, my conclusion is that students have been

undressing down to their underwear in public and with the opposite sex present.  As I

stated in our conference, 'this is totally unacceptable.'"  Def.'s Ex. 14.  For the most part,

Mr. Sickels addressed the cited issues and need for improvement so that they did not

reoccur.[7]  However, on the whole, he was displeased with his December 2008

performance evaluation, which referred to the above-mentioned student lawsuit and

included the criticism that he "did not circulate around in the classroom."  *Id.* at 13.

---

[6]We note that Mr. Sickels has characterized this episode as "the school . . . not allow[ing] him to park close to his class."  Pl.'s Resp. at 15.  Additionally, Mr. Sickels received an email from Mr. Strader regarding his parking dispensation that said "there are always some exceptions to the rules," a comment he contends was "insulting and unnecessary."  Def.'s Mot. for S.J. at 11.  Even viewing all evidence in the light most favorable to Mr. Sickels, we nevertheless find as a matter of fact that Central Nine did accommodate Mr. Sickels's parking request and that Mr. Strader's comment was merely an acknowledgment of having made such an accommodation.

[7]We refer here to the second two incidents, noting that Mr. Sickels found a classroom where the students could change and that no other PT football games occurred thereafter.

On February 19, 2009, Mr. Sickels was admitted to the hospital with coronary artery disease. He had surgery on February 23 and was absent from work for approximately one month, until March 26, 2009. Def.'s Mot. for S.J. at 13. Although he was not given FMLA paperwork relating to this absence, he received paid leave until it "ran out" in mid-March. He returned to work with "even more impaired" mobility and "issues with stamina." As a result, he needed to attend three hours of rehabilitation during his first week back on the job, which Central Nine accommodated. *Id.* at 14.

April 2009 appears to have been the proverbial "beginning of the end" for Mr. Sickels. His April 17 performance evaluation, while noting several positive aspects of his teaching, continued to recommend compliance with the Performance Improvement Plan. The evaluation stated that Mr. Sickels stayed behind his desk while teaching and was using test questions to cover class material. Moreover, it cited poor student behavior in the form of their not paying attention, playing a prank on Mr. Sickels's substitute, and making copies in class that should have been made prior to that time. Def.'s Mot. for S.J. at 14-15. Mr. Sickels responded to the evaluation by asserting that he was not responsible for students' behavior but that he would comply with the Performance Improvement Plan. However, he also requested a meeting with Dr. Hagen to discuss the evaluation and said that "Central Nine 'sickened' him and . . . he would not work there if they begged him." *Id.* at 15.

Before their meeting, Dr. Hagen had become aware that Mr. Sickels "was still having issues with classroom management" and that "administrators felt that [he] should

have had the judgment to know what was appropriate" when teaching. Def.'s Mot. for S.J. at 15. Specifically, Mr. Strader told him that, "although no one single incident justified non-renewal [of Mr. Sickels's contract]," Mr. Sickels was not performing at the level expected of second-year teachers. *Id.* Mr. Strader, who had previously been "reluctant" to opt not to renew Mr. Sickels's contract, no longer recommended continued employment for him by April 2009. This was the shared sentiment among Central Nine's administrators; after reviewing their advice, Mr. Sickels's evaluations, and disciplinary memoranda, Dr. Hagen had been persuaded to recommend the non-renewal of Mr. Sickels's contract to Central Nine's governing board. *Id.* at 16. He informed Mr. Sickels of his decision during their late April meeting,[8] noting that he had recommended non-renewal because it was in the "best interest of the District" and in light of "multiple incidents of poor judgment." *Id.*

Mr. Sickels exercised his right to a conference with Central Nine's governing board about the potential non-renewal of his contract on May 14, 2009. Both he and Dr. Hagen addressed the board during its executive session, and the board voted not to renew Mr. Sickels's contract at its public meeting that night. Def.'s Mot. for S.J. at 16-17. In the same meeting, the board voted not to renew the contract of Jess O'Brien, a first-year welding instructor. Mr. O'Brien's situation resembled Mr. Sickels's in that "multiple

---

[8]Dr. Hagen asserts that he handed Mr. Sickels a notice that the board was considering non-renewal at the conclusion of their April 2009 meeting. He acted accordingly because Mr. Sickels did not refute comments in his performance evaluations with specific information when they met. Def.'s Ex. No. 22. This notice was dated April 27, 2009. Def.'s Ex. 32.

incidents of poor judgment," rather than one offense, were deemed to justify his termination. Like Mr. Sickels, he had been disciplined only by written reprimand. Mr. O'Brien was not disabled, and he filed no charges with the EEOC after being terminated. *Id.* at 17.

On May 20, 2009, via letter signed by Dr. Hagen, Central Nine notified Mr. Sickels that the governing board had voted not to renew his contract after the 2008-09 school year. Mr. Sickels understood that this letter represented the official termination of his employment, but he believed "the school [had been] trying to fire him" since January 2008. Def.'s Ex. 46 at 338; Def.'s Mot. for S.J. at 18. Thus, he filed a timely Charge of Discrimination against Central Nine with the EEOC on June 26, 2009 and received a Notice of Right to Sue from the EEOC on or about January 15, 2010. He filed a Complaint in the Johnson Superior Court on April 1, 2010, and Central Nine filed its notice of removal to this court on April 22, 2010.

## Legal Analysis

### I.  Standard of Review

Summary judgment is appropriate when the record shows that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding whether genuine issues of material

fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party. *See id.* at 255. However, neither the "mere existence of *some* alleged factual dispute between the parties," *id.* at 247, nor the existence of "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), will defeat a motion for summary judgment. *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692 (7th Cir. 2000).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. The party seeking summary judgment on a claim on which the non-moving party bears the burden of proof at trial may discharge its burden by showing an absence of evidence to support the non-moving party's case. *Id.* at 325. According to the Seventh Circuit's reading of the *Celotex* standard, summary judgment is appropriate where the non-moving party fails to establish "an element essential to his claim." *Beauchamp v. City of Noblesville*, 320 F.3d 733, 742 (7th Cir. 2003) (citing *Celotex*, 477 U.S. at 322).

Summary judgment is not a substitute for a trial on the merits, nor is it a vehicle for resolving factual disputes. *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Therefore, after drawing all reasonable inferences from the facts in favor of the non-movant, if genuine doubts remain and a reasonable fact-finder could find for the party opposing the motion, summary judgment is inappropriate. *See Shields Enters. v.*

*First Chi. Corp.*, 975 F.2d 1290, 1294 (7th Cir. 1992); *Wolf v. City of Fitchburg*, 870 F.2d 1327, 1330 (7th Cir. 1989). But if it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish his or her case, summary judgment is not only appropriate, but mandated. *See Celotex*, 477 U.S. at 322; *Ziliak v. AstraZeneca LP*, 324 F.3d 518, 520 (7th Cir. 2003). Further, a failure to prove one essential element "necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.

A plaintiff's self-serving statements which are speculative or which lack a foundation of personal knowledge, and which are unsupported by specific concrete facts reflected in the record, cannot preclude summary judgment. *Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001); *Stagman v. Ryan*, 176 F.3d 986, 995 (7th Cir. 1999); *Slowiak v. Land O'Lakes, Inc.*, 987 F.2d 1293, 1295 (7th Cir. 1993).

The summary judgment standard is applied rigorously in employment discrimination cases because intent and credibility are critical issues, and direct evidence is rarely available. *Seener v. Northcent. Tech. Coll.*, 113 F.3d 750, 757 (7th Cir. 1997); *Wohl v. Spectrum Mfg., Inc.*, 94 F.3d 353, 354 (7th Cir. 1996). To that end, we carefully review affidavits and depositions for circumstantial evidence which, if believed, would demonstrate discrimination. However, the Seventh Circuit has also made clear that employment discrimination cases are not governed by a separate set of rules; thus, they remain amenable to disposition by summary judgment so long as there is no genuine dispute as to the material facts. *Giannopoulos v. Brach & Brock Confections, Inc.*, 109 F.3d 406, 410 (7th Cir. 1997).

## II. Discussion

### A. Request to Strike Exhibit

As a preliminary matter, we address Central Nine's request that the Court strike from the record "Schultz-2," one of the exhibits accompanying Mr. Sickels's Response opposing summary judgment (Pl.'s Ex. 31).[9]  In a contemporaneous declaration, Mr. Sickels's counsel describes the exhibit as "a true, accurate, and complete copy of an email exchange over a two-day period from February 21, 2008 to February 22, 2008 between Tim Lavery and Eric Fredbeck[10] and including Jeanette Craw and John Strader regarding 'RIF time-line'."  Mr. Sickels relies on this exhibit to support the proposition that, "no later than February 21, 2008, Central Nine had already made the decision to fire [him]." Pl.'s Resp. at 10-11.  Central Nine rejoins that this email was inadvertently produced and originally designated for exclusion due to the attorney-client privilege.  Def.'s Reply at 2.

The attorney-client privilege "protects confidential communications made by a client to his lawyer '[w]here legal advice of any kind is sought . . . from a professional legal advisor in his capacity as such.'"  *Rehling v. City of Chi.*, 207 F.3d 1009, 1019 (7th Cir. 2000) (citation omitted).  Our inquiry into whether a document is subject to this privilege is fact-sensitive; "[o]nly when the district court has been exposed to the

---

[9]Central Nine appropriately raises this issue in its reply brief rather than as a separate motion to strike.  "Collateral motions in the summary judgment process, such as motions to strike, are disfavored.  Any dispute regarding the admissibility or effect of evidence should be addressed in the briefs."  S.D. Ind. Local R. 56.1(f).

[10]Mr. Fredbeck serves as counsel to Central Nine.

contested documents and the specific facts which support a finding of privilege under the attorney-client relationship . . . can it make a principled determination as to whether the attorney-client privilege in fact applies." *In re Grand Jury Proceedings*, 220 F.3d 568, 571 (7th Cir. 2000) (citation omitted).

The Seventh Circuit has adopted Professor Wigmore's required elements for parties attempting to assert the attorney-client privilege. These elements are as follows:

> (1) [w]here legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal advisor; (8) except the provision [may] be waived.

*United States v. Evans*, 113 F.3d 1457, 1461 (7th Cir. 1997) (citing 8 JOHN HENRY WIGMORE, EVIDENCE IN TRIALS AT COMMON LAW § 2292 (McNaughton rev. 1961)); *Long v. Anderson Univ.*, 204 F.R.D. 129, 134 (S.D. Ind. 2001). The privilege belongs to the client. *Sandra T.E. v. S. Berwyn Sch. Dist. 100*, 600 F.3d 612, 618 (7th Cir. 2010). As the party invoking this privilege, Central Nine bears the burden of establishing that each requirement has been met. *Evans*, 113 F.3d at 1461.

The parties have debated this piece of evidence from several angles; for instance, they have argued about whether the email constitutes legal advice from Mr. Fredbeck in his capacity as a legal, rather than business, advisor to Central Nine. *See Evans*, 113 F.3d at 1463 (noting that the privilege does not apply where the attorney speaks as a friend, business advisor, or political consultant). In Mr. Sickels's opinion, the privilege does not

apply because Mr. Fredbeck was engaging Central Nine in a business-related communication about facts. Mr. Sickels's counsel suggests that the appropriate course of action is to redact this exhibit, removing the portion of the email containing any advice given by Mr. Fredbeck. Pl.'s Surreply at 5, 5 n.3. Based on our review of the record, and because we elect not to strike the exhibit, we see no reason to redact it.

We believe the parties have imbued this document with far more significance than it deserves. Indeed, Mr. Sickels appears to view the email as a "smoking gun" demonstrating untruthfulness so great that the Court may (indeed, must) infer intentional discrimination based on its contents. This is a bridge too far. As we understand the exhibit, it consists of three emails: (1) a list of names provided by Mr. Lavery, none associated with a particular employment action or decision; (2) Mr. Fredbeck's response, which ostensibly provided hypothetical notice dates and asked miscellaneous questions; and (3) Mr. Lavery's reply to Mr. Fredbeck's questions. Nothing in the document or any related, explanatory declaration or affidavit lends clarity to our analysis. To the extent the parties contend that it is or is not legal advice, we do not believe its import as such is obvious. We certainly cannot agree that the email chain dealt with "teachers who were going to be terminated," Pl.'s Resp. at 10 n.5, or that it gave advice to Central Nine on terminating them. The weight of this evidence is *de minimis* and its significance immaterial as support for a finding that it qualifies as a communication protected by the attorney-client privilege. Thus, we DENY Central Nine's request to strike "Schultz-2"

from the record and to redact certain portions of it.

## B. Discrimination Claim

Mr. Sickels contends that he was terminated because of his disability or perceived disability, in violation of the ADA. Under the ADA, as amended by the ADAAA, "[n]o covered entity[11] shall discriminate against a qualified individual on the basis of disability in regard to . . . discharge of employees." 42 U.S.C. § 12112(a); *Kinney v. Century Servs. Corp. II*, No. 1:10-cv-00787-JMS-DML, 2011 WL 3476569, at *9 (S.D. Ind. Aug, 9, 2011). A plaintiff bears the burden of proof that he is a "qualified individual" as defined by the ADA—in other words, "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that [he] holds or desires." 42 U.S.C. § 12111(8); *Walter v. Wal-Mart Stores Inc.*, No. 4:09-cv-15-JD, 2011 WL 4537931, at *10 (N.D. Ind. Sept. 28, 2011). Our first task, therefore, is to determine whether Mr. Sickels was "disabled" as that term is contemplated by the statute.

The ADA provides that an individual is disabled if he: (1) has a physical or mental impairment that "substantially limits" at least one "major life activit[y]"; (2) has a record of this type of impairment; or (3) is regarded by her employer as having such an impairment. 42 U.S.C. § 12102(1). Major life activities "include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking,

---

[11]The ADA defines "covered entity" as "an employer, employment agency, labor organization, or joint labor-management committee." 42 U.S.C. § 12111(2).

standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." *Id.* § 12102(2)(A). Mr. Sickels alleges physical impairments resulting from his stroke and heart condition that substantially limited his mobility. Because mobility could impact several major life activities—walking, lifting, standing, and bending—and bearing in mind that Central Nine regarded Mr. Sickels's physical impairments as qualifying disabilities for ADA purposes, we conclude that he is "disabled" within the meaning of the statute.

We next assess whether Mr. Sickels is a "qualified individual" under the ADA. The Seventh Circuit has set forth a two-part test for this determination that requires a plaintiff to demonstrate that he (1) has "the requisite skill, experience, education, and other job-related requirements" of the job, and (2) can perform the essential functions of the job, irrespective of reasonable accommodations. *Ross v. Ind. State Teacher's Ass'n Ins. Trust*, 159 F.3d 1001, 1013 (7th Cir. 1998) (citing 29 C.F.R. § 1630.2(m)). The parties do not dispute that Mr. Sickels met the basic background qualifications for the law enforcement instructor position. Similarly, Central Nine does not allege that Mr. Sickels cannot perform the essential functions of teaching law enforcement classes. Based on his educational qualifications and work experience as a police officer and college instructor, we conclude that he satisfies the description of a "qualified individual."

Having deemed Mr. Sickels a qualified individual with a disability as contemplated by the ADA, we turn to his discrimination claim. A plaintiff alleging

employment discrimination based on a disability may proceed under either the direct or indirect method of proof. *Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 503 (7th Cir. 2004); *Robin v. Espo Eng'g Corp.*, 200 F.3d 1081, 1089 (7th Cir. 2000). For the direct method of proof, he may satisfy his burden by presenting either direct or circumstantial evidence. *Dickerson v. Bd. of Trs. of Comm. Coll. Dist. No. 522*, 657 F.3d 595, 601 (7th Cir. 2011). "The former 'essentially requires an admission by the decision-maker that his actions were based upon the prohibited animus' . . . [and] [t]he latter is evidence that 'allows a jury to infer intentional discrimination by the decision-maker.'" *Buie*, 366 F.3d at 503 (quoting *Rogers v. City of Chi.*, 320 F.3d 748, 753 (7th Cir. 2003)). Because employers are usually disinclined to make outright admissions of animus, courts permit several forms of circumstantial evidence. Such evidence may include: "(1) suspicious timing; (2) ambiguous statements or behavior towards other employees in the protected group; (3) evidence . . . that similarly situated employees outside the protected group systematically receive better treatment; and (4) evidence that the employer offered a pretextual reason for an adverse employment action." *Dickerson*, 657 F.3d at 601 (citing *Diaz v. Kraft Foods Global, Inc.*, 653 F.3d 582, 586-87 (7th Cir. 2011); *Burnell v. Gates Rubber Co.*, 647 F.3d 704, 708 (7th Cir. 2011)).

If a plaintiff lacks direct evidence of discrimination, the indirect method of proof is available to him. This method first requires him to establish a *prima facie* case of discrimination by showing that: (1) he is disabled within the meaning of the ADA; (2) he

was meeting his employer's "legitimate employment expectations"; (3) he suffered an adverse employment action; and (4) similarly situated employees without a disability received more favorable treatment. *Lloyd v. Swifty Transp., Inc.*, 552 F.3d 594, 601 (7th Cir. 2009); *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). If he succeeds in making his *prima facie* case, the burden then shifts to his employer to "articulate some legitimate, nondiscriminatory reason for the employee's rejection." *McDonnell Douglas Corp.*, 411 U.S. at 802. If the employer meets its burden, the plaintiff must prove by a preponderance of the evidence that the employer's proffered reason is pretextual. *Dickerson*, 657 F.3d at 601.

## 1. Direct Method

Mr. Sickels relies on the direct method of proof in framing his claim of disability discrimination. Although he supplies no direct evidence of Central Nine's discriminatory intent, he believes he deserves to have his case considered by a jury based on circumstantial evidence in the record. He finds support for this position in *Troupe v. May Department Stores Co.*, 20 F.3d 734, 737 (7th Cir. 1994), where the Seventh Circuit held that circumstantial evidence of intentional discrimination may consist of "ambiguous statements, suspicious timing, discrimination against other employees, and other pieces of evidence none conclusive in itself but together composing a convincing mosaic of discrimination against the plaintiff." However, such circumstantial evidence "must point directly to a discriminatory reason for the employer's action." *Adams v. Wal-Mart Stores,*

*Inc.*, 324 F.3d 935, 939 (7th Cir. 2003).

Here, Mr. Sickels alleges that the jury "can infer from the words the administrators used . . . [when evaluating Mr. Sickels] that they were unhappy about Sickels'[s] lack of mobility (which results from his disability)." Pl.'s Resp. at 31. Specifically, he cites four comments set out in his performance evaluations that relate to the location from which he physically presented his lectures and lessons in his classroom:

> (1) Mr. Sickels stays seated primarily to the side of the room. This creates areas of the room that are not monitored . . . .
>
> (2) I have never observed Mr. Sickels anywhere in the classroom except at his desk . . . .
>
> (3) I have never observed Mr. Sickels anywhere in the classroom except at his desk or in front of the classroom. Very traditional teacher.
>
> (4) When possible, Mr. Sickels should not only present from his desk and in front of the classroom, but from the sides, back[,] etc. . . . [to] help keep students engaged and also see those not taking notes, not paying attention, etc.

*Id.* at 31-32. Mr. Sickels characterizes these comments as "ambiguous statements," but, when combined with the "suspicious timing" of the recommendation not to renew his contract, they constitute sufficient circumstantial evidence to satisfy his burden of proof using the direct method. *Id.* at 32. Further, he asserts that Central Nine's "other inconsistent statements and deception about the date the [non-renewal] decision was made" create a genuine issue of material fact regarding discrimination. *Id.* He does not elaborate on what statements were allegedly inconsistent, but relies on "Schultz-2," the email chain described above, as proof that Central Nine administrators decided to

terminate his employment in February of 2008, not April of 2009.

As we examine the comments made to Mr. Sickels in the context of his performance evaluations, we are mindful that "how recent the comments were, how extreme, and who made the remarks are pieces of evidence that inform whether there was a 'mosaic of discrimination.'" *Paz v. Wauconda Healthcare & Rehab. Ctr., LLC*, 464 F.3d 659, 666 (7th Cir. 2006). These particular comments to and about Mr. Sickels occurred in November 2007, December 2008, April 2009, and April 2009, respectively. While this timing could suffice if Mr. Sickels's termination had "followed on the heels of [Central Nine]'s discovery of [his] disability," Seventh Circuit precedent instructs us that "[a] temporal sequence analysis is not a magical formula which results in a finding of a discriminatory cause." *Buie*, 366 F.3d at 506 (quoting *Foster v. Arthur Andersen, LLP*, 168 F.3d 1029, 1034 (7th Cir. 1999)). The record is clear on this point, and the parties do not contest that Central Nine knew of his disability in the early summer of 2007—well before his first day of teaching—or that his termination occurred two years later, in the spring of 2009. We thus are not persuaded that the chronology of comments tips the balance in favor of a finding of direct discrimination by Central Nine against Mr. Sickels.

Perhaps more importantly, we find the comments' content as well as their source wholly benign and entirely appropriate to the school setting. We do not believe any reasonable person could conclude that requesting Mr. Sickels to circulate around his

classroom demonstrates animus toward him due to disability.  It is altogether reasonable for school administrators to suggest or direct that an instructor not teach exclusively from his desk or from a single location, thereby leaving some students unmonitored and unengaged.  By his own admission, Mr. Sickels used a wheelchair for only two weeks at Central Nine; when he did, he was able to cover distances as great as one hundred yards. Def.'s Ex. 40 at 73.  He also admits that when he switched to a cane, he was still able to cover such distances.  *Id.* at 78.  In fact, the only subsequent instance in which such movement would have been restricted or otherwise challenging was after his car accident—when he again resorted to a wheelchair, as he had in the past.  *Id.* at 79.  We therefore conclude that it was entirely reasonable to expect Mr. Sickels to move around his classroom "when possible," as his evaluators recommended.  Moreover, even if we were to view this constructive criticism as being somehow unduly harsh, we do not believe it rises to the level of mistreatment due to his disability.  As a result, his attempt through these facts to establish a "convincing mosaic" of discrimination comes up short.

### 2. Indirect Method

Mr. Sickels has not expressly utilized the indirect method to prove his claim of disability discrimination. However, even if he had relied on this method, we would necessarily reject his argument because he cannot establish the requisite *prima facie* case. To be sure, two elements of this method are satisfied; his disability renders him a member of a protected class, and the non-renewal of his contract was an "adverse employment action."  *See de la Rama v. Ill. Dep't of Human Servs.*, 541 F.3d 681, 685 (7th Cir. 2008)

(noting that "adverse [employment] actions must be materially adverse . . . [which] might be indicated by a termination of employment").  His case fails, however, on the other two elements of the *McDonnell Douglas* test: that (1) he was meeting Central Nine's legitimate performance expectations; and (2) a similarly situated co-worker who is not disabled was treated more favorably.

Central Nine's legitimate performance expectations can be found on its Teacher Evaluation Form, which provides thirty-two teaching benchmarks grouped into four categories:  classroom environment, preparation and instruction, use of resources, and professionalism.  *See* Def.'s Ex. 10.  Mr. Sickels has acknowledged the school's position, as stated by Mr. Strader, that "[a]nything negative on an evaluation is severe" and that negative comments on a performance evaluation equate to a written warning.  Pl.'s Ex. 11 at 105-06.  Thus, as early as November 13, 2007, he was on notice of seven competencies in which he did not meet teaching expectations, problems all legitimately viewed as "severe" by his employer.  Pl.'s Ex. 3.  He was still not meeting expectations in three competencies—two from the previous evaluation—when he was assessed again in April of 2008.  Pl.'s Ex. 4.  More importantly, Mr. Sickels was aware that he had a pattern of falling short of Central Nine's standards, as evidenced by his signature on the April 2008 Performance Improvement Plan.  He is presumed to have understood Principal Strader's directive stating, "Even though Mr. Sick[els] will be a second year teacher next fall, I am requiring him to participate with the first year teachers concerning schedule meetings to review lesson plans, discuss curriculum and classroom management issues/concerns."  *Id.*

at 3.

Mr. Sickels's situation fared no better during his second year of teaching; his December 2008 evaluation contained even more "needs improvement" ratings than did the April 2008 evaluation. Mr. Sickels knew that Central Nine's principal was "disappointed in [his] progress from a first year teacher to a second year teacher," just as he was fully on notice of his probationary status vis-a-vis his Performance Improvement Plan. Pl.'s Ex. 10 at 3-4. Thus, even without considering numerous other documented problems, we find the record replete with evidence that Mr. Sickels was consistently not teaching at a level required of Central Nine personnel. These cited deficiencies—*e.g.*, students changing in the hallway, loaning his car to a student, sharing his computer password with students, and permitting activities not conducive to learning—considered in the light most favorable to Mr. Sickels (which is hard to do, given their clear negative connotations), we can only conclude that Mr. Sickels showed sufficiently poor teaching to justify his termination.

We also note that in spite of his many attempts to obscure these facts with unsubstantiated allegations of Central Nine's untruthfulness, Mr. Sickels has failed to rebut the school's performance evaluations. Dr. Hagen's remark in the affidavit describing his April 2009 meeting with Mr. Sickels is telling: "[H]ad Sickels said anything to persuade me not to go through with the non-renewal, I would not have given him the notice. During the meeting, Sickels indicated the evaluation was 'unfair' but did not give any specific information to refute what was said in the evaluation." Def.'s Ex.

24

22 at 6.  Given the weight of the evidence, it is obvious that by Central Nine's standards,

Mr. Sickels was not a satisfactory teacher and that he was fired for this reason, not based

on any discriminatory animus.  For most of the two years he worked at Central Nine, he

was on actual and constructive notice that his performance did not meet the school's

standards.  He failed on numerous occasions to rebut evidence that he was not meeting

Central Nine's legitimate performance expectations with supportable facts, and he

certainly raises no genuine issue of material fact regarding this situation.  Accordingly,

his claim founders on this prong of the *McDonnell Douglas* test.

In addition, Mr. Sickels would not succeed under this method of proof due to his

failure to establish in any sense that he was treated less favorably than similarly situated

employees.  A plaintiff must demonstrate that there is someone who is "directly

comparable to [him] in all material respects."  *Serednyj v. Beverly Healthcare, LLC*, 656

F.3d 540, 551 (7th Cir. 2011) (citation omitted).  Although the plaintiff and the allegedly

similarly situated employee "need not be 'identical,' . . . the plaintiff must show that the

other employee 'dealt with the same supervisor, [was] subject to the same standards, and

had engaged in similar conduct without such differentiating or mitigating circumstances

as would distinguish [his] conduct or the employer's treatment of [him].'" *Caskey v.

Colgate-Palmolive Co.*, 535 F.3d 585, 592 (7th Cir. 2008) (citations omitted).  This

means that Mr. Sickels must identify a comparison employee who held the same job (non-

permanent teacher), engaged in the same or comparable misconduct (poor judgment and

failure to meet performance expectations), was not a member of his protected class

(disabled), and was treated more favorably (was not terminated).

The record reveals only one non-permanent instructor with whom Mr. Sickels might be compared for these purposes: Jess O'Brien, a first year welding instructor. Like Mr. Sickels, Mr. O'Brien worked as a non-permanent teacher, dealt with Mr. Strader as his supervisor, and was rated according to the school's Teacher Evaluation Form. He was not disabled, but he managed to raise supervisors' eyebrows by "wearing inappropriate clothing, [committing] safety violations, and using his personal laptop computer to do work for another employer during duty time and to access [blocked] internet sites." Def.'s Mot. for S.J. at 17; Def.'s Ex. 37. Central Nine's board ultimately deemed Mr. O'Brien lacking in both proper judgment and mastery of the standards expected of their teachers, which is why they opted not to renew his contract at their May 14, 2009 meeting. Where Mr. O'Brien's situation differs markedly from that of Mr. Sickels, though, is the speed with which he was terminated. Mr. O'Brien was terminated after one year of teaching, having only received one written reprimand; Mr. Sickels was given a second year to improve. Because we find that Mr. O'Brien was treated no more favorably—indeed, he was treated less favorably—than Mr. Sickels, he is not a similarly situated employee who was treated more favorably, as required by *McDonnell Douglas*. We therefore find this element of the indirect method unsatisfied as well.

The lack of a *prima facie* case dooms Mr. Sickels's Title VII discrimination claim. However, even if it did not, Central Nine has successfully met its burden to provide a legitimate, non-discriminatory reason for its adverse employment action: Mr. Sickels's

poor judgment and failure to improve despite participating in the Performance Improvement Plan. "[T]his burden is . . . quite light; the employer need not persuade the court that [it] was actually motivated by the reason [it] gives[,] and the mere articulation of the reason rebuts the prima facie case and puts the onus back on the plaintiff to prove pretext." *Pilditch v. Bd. of Educ. of City of Chi.*, 3 F.3d 1113, 1117 (7th Cir. 1993). As discussed above, the record contains substantial evidence in support of Central Nine's claim that Mr. Sickels exhibited subpar judgment and teaching skills. The evaluations of Mr. Sickels, combined with his written warning and notes from meetings with administrators, amply satisfy Central Nine's burden.

We also find that any evidence of pretext on Central Nine's part is demonstrably thin. At most, Mr. Sickels makes the claim that administrators' comments "can easily be read as critical of Sickels'[s] immobility (resulting from his disability)." Pl.'s Resp. at 30. Whether or not this is true, Seventh Circuit precedent instructs that "[i]t is not sufficient to prove that the reason was doubtful or mistaken. . . . '[P]retext' does not mean simply a 'mistake,' but rather 'a lie, specifically a phony reason for some action.'" *Crim v. Bd. of Educ. of Cairo Sch. Dist. No. 1*, 147 F.3d 535, 541 (7th Cir. 1998) (quoting *Russell v. Acme-Evans Co.*, 51 F.3d 64, 68 (7th Cir. 1995)). Similarly, an employee must do more than speculate to establish pretext. *Winsley v. Cook Cnty.*, 563 F.3d 598, 605 (7th Cir. 2009). Mr. Sickels devotes virtually none of his argument to proving pretext; he merely asserts that "Central Nine is not telling the truth" about the date the termination decision was made and that "the jury is free to infer discrimination and pretext from [Central

Nine's] untruthfulness."  Pl.'s Resp. at 30.  We remind Mr. Sickels that unsupported

allegations do not establish the required link between his disability and his treatment by

Central Nine.  *See Winsley*, 563 F.3d at 605.

Furthermore, to the extent that Mr. Sickels claims these non-discriminatory

reasons were a smokescreen to hide Ms. Craw's animus regarding the student affair

allegations, his argument also fails.  Mr. Sickels believes it is "highly telling" to see what

Ms. Craw decided to criticize him for, and although we agree, we do not reach the

conclusion he has drawn about the comments.  Specifically, we find no evidence to

support the conclusion that any belief she may have had about his alleged relationship

with the female student was in any way related to his disability or provided a cover for

her discriminatory animus towards Mr. Sickels.  Nor was her investigation of this alleged

incident, including presenting Mr. Sickels with a "Garrity letter," improper in any way.  If

anything, the school is entitled to credit for taking a situation of potential teacher-student

misconduct seriously.  The Seventh Circuit has made its position on the import of *Garrity*

*v. New Jersey*, 385 U.S. 493 (1967), very clear: "We have interpreted *Garrity* to mean

that the [g]overnment 'has every right to investigate allegations of misconduct . . . by its

employees, and even to force them to answer questions pertinent to the investigation.'"

*Driebel v. City of Milwaukee*, 298 F.3d 622, 638 n.8 (7th Cir. 2002).

For all of the foregoing reasons, we find that Mr. Sickels has not properly

established a Title VII discrimination claim under either the direct or indirect method of

proof.  We therefore GRANT Central Nine's motion for summary judgment on this claim.

## C.  Retaliation Claims

### 1.  Title VII Claim

Mr. Sickels alleges that after he engaged in "protected conduct" while still working at Central Nine, he was "subject to a pattern and practice of retaliation and further discrimination."  Compl. ¶ 18.  He cites the following actions as protected conduct:  accusing Ms. Craw of harassment; advising Mr. Strader that he was preparing to file a charge of age and sex discrimination with the EEOC; filing this charge in April 2008; and mediating the charge.  Pl.'s Resp. at 26.  Moreover, he contends that similarly situated teachers who did not engage in protected conduct were not treated as he was.

"Title VII protects employees from retaliation for complaining about the types of discrimination it prohibits."  *Hine v. Extremity Imaging Partners, Inc.*, 773 F. Supp. 2d 788, 798 (S.D. Ind. 2011) (quoting *Antonetti v. Abbott Labs.*, 563 F.3d 587, 592 (7th Cir. 2009)).  A plaintiff seeking to demonstrate retaliation has two methods of proof:  the direct method and the indirect method, which is also known as the "burden-shifting method."  *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 662 (7th Cir. 2006).  Under the direct method, he must present sufficient evidence to show that "(1) he engaged in statutorily protected activity; (2) he suffered an adverse action taken by the employer; and (3) [there was] a causal connection between the two."  *Moser v. Ind. Dep't of Corr.*, 406 F.3d 895, 903 (7th Cir. 2005).  Proving retaliation under the indirect method requires the plaintiff to "establish . . . that: (1) []he engaged in a statutorily protected activity; (2) []he met the employer's legitimate expectations; (3) []he suffered an adverse employment

action; and (4) []he was treated less favorably than similarly situated employees who did not engage in statutorily protected activity." *Tomanovich*, 457 F.3d at 663 (quoting *Moser*, 406 F.3d at 903). Mr. Sickels contends that he has presented sufficient evidence to avoid summary judgment under both methods.

With respect to the direct method of proving retaliation under Title VII, we concede that Mr. Sickels can establish the first two elements he must prove. First, he engaged in conduct protected by Title VII when he filed his EEOC charge. *See* 42 U.S.C. § 2000e-3(a) ("It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . to discriminate against any individual . . . because he has made a charge . . . under this subchapter."). Although he has not shown that he suffered unlawful discrimination or harassment, it suffices for this test that he "held 'a sincere and reasonable belief' that [he] was opposing conduct that violated Title VII." *Gee v. City of Lawrence*, No. 1:07-cv-01604-SEB-JMS, 2009 WL 1196407, at *7 (S.D. Ind. May 1, 2009). He also satisfies the second prong of this method because his termination constitutes an "adverse employment action." However, his success ends there because he cannot meet the burden required of a plaintiff under this method to show a causal connection between the alleged retaliatory action and his statutorily protected conduct.

To prove a causal connection between his protected conduct and his termination, Mr. Sickels must show either "an admission of discrimination" or "a convincing mosaic of circumstantial evidence that allows a jury to infer intentional discrimination by the

decisionmaker." *Ridings v. Riverside Med. Ctr.*, 537 F.3d 755, 771 (7th Cir. 2008). As previously noted, no admissions of discrimination have been adduced. There also is no proof constituting the requisite "convincing mosaic of circumstantial evidence" given Mr. Sickels's failure to establish his discrimination claim. Certainly, "[w]hen an adverse employment action follows close on the heels of protected expression and the plaintiff can show the person who decided to impose the adverse action knew of the protected conduct, the causation element of the *prima facie* case is typically satisfied." *Culver v. Gorman & Co.*, 416 F.3d 540, 546 (7th Cir. 2005). Here, however, Mr. Sickels's termination, which occurred a full year after he filed the EEOC charge, does not raise an inference of causal connection. The Seventh Circuit has rejected a bright-line numeric rule for "suspicious timing" in this context, "but when there is corroborating evidence of retaliatory motive . . . an interval of a few weeks or even months may provide probative evidence of the required causal nexus." *Coleman v. Donahoe*, –F.3d–, 2012 WL 32062, at *19 (7th Cir. 2012). Without more, the timing of Mr. Sickels's termination is too far removed from his protected conduct to support a causal connection.

Moreover, we see no "corroborating evidence of retaliatory motive" that might otherwise revive Mr. Sickels's argument under this method. His allegation that "[w]hen he complained of harassment by Craw . . . Central Nine put his name on a list of teachers who would be fired," as we previously discussed with respect to the ambiguous "Schultz-2" email, lacks merit. His assertion that he received a negative performance evaluation days after he filed the EEOC charge is equally immaterial given the Seventh Circuit's

stance that "negative performance evaluations, standing alone, are not cognizable adverse employment actions." *de la Rama*, 541 F.3d at 685.  We conclude that Mr. Sickels has not properly demonstrated a "change in the terms or conditions of employment," *id.*, to justify deeming these evaluations "adverse employment actions" to consider in a retaliation claim, and we therefore find that he has failed to prove his Title VII retaliation claim using the direct method of proof.

Mr. Sickels is unable to prove retaliation under the indirect method for the same reasons he has foundered in trying to prove his claim under the direct method.  Specifically, as we have determined based on the record before us, he did not meet Central Nine's legitimate expectations.  Nor can he cite a similarly situated employee treated more favorably, such as Mr. O'Brien, who was terminated contemporaneously, and who did not engage in protected conduct.  Because Mr. Sickels cannot establish his *prima facie* case, the indirect method of proof is unavailable to him.  Thus, we GRANT Central Nine's motion for summary judgment regarding Mr. Sickels's claim alleging retaliation in violation of Title VII.

### 2. FMLA Claim

Mr. Sickels also alleges that Central Nine terminated his employment in retaliation for exercising or attempting to exercise protected rights under the FMLA.  The FMLA makes it unlawful for an employer to "discharge or in any other manner discriminate against any individual" for exercising rights protected by the FMLA.  29 U.S.C. § 2615(a)(2).  Among the rights covered in this statute is entitlement to twelve work weeks

of leave during any twelve-month period for a "serious health condition." *Id.* §

2612(a)(1)(C). The FMLA defines a "serious health condition" as "an illness, injury,

impairment, or physical or mental condition that involves . . . inpatient care in a hospital,

hospice, or residential medical care facility; or . . . continuing treatment by a health care

provider." *Id.* § 2611(11). "Eligible employees," or those who have been employed "for

at least [twelve] months by the employer . . . and . . . for at least 1,250 hours of service

with such employer during the previous [twelve]-month period," may take advantage of

these provisions. *Id.* § 2611(2)(A).

Mr. Sickels's FMLA claim fails for the same reasons his retaliation claim fails

under Title VII. This is because the standard for evaluating retaliation under the FMLA is

the same standard used for evaluating retaliation under Title VII. *See Breneisen v.*

*Motorola, Inc.*, 512 F.3d 972, 979 n.3 (7th Cir. 2008). As before, Mr. Sickels argues that

his last negative performance evaluation and termination occurred soon enough after he

exercised FMLA-protected leave to support a causal connection. To be sure, we

understand the disappointment inherent in losing one's job one month after returning to

work from illness. But we cannot, as Mr. Sickels would have us do, infer that he was

terminated *because of* his having used this leave with no facts to support the inference.

There are simply not enough pieces of information to form a multi-part "convincing

mosaic." To the contrary, the record indicates that Central Nine had flagged Mr. Sickels

for poor judgment and below-average teaching well before his leave. We necessarily

conclude that he cannot prove his FMLA retaliation claim via the direct method. Further,

following our analysis on the previous claims, his failure to meet Central Nine's legitimate performance expectations precludes him from using the indirect method of proof. As such, we now GRANT Central Nine's motion for summary judgment as to Mr. Sickels's FMLA claim.

### 3. ADA Claim

Lastly, Mr. Sickels alleges that Central Nine retaliated against him for seeking accommodations for his disability, which the Seventh Circuit has deemed "protected conduct." *See Cassimy v. Bd. of Educ. of Rockford Pub. Schs., Dist. No. 205*, 461 F.3d 932, 938 (7th Cir. 2006). ADA retaliation claims may be established using either the direct or indirect method of proof. *See Serednyj*, 656 F.3d at 556. Once again, and without rehashing our prior analysis, we conclude that Mr. Sickels's failure to meet Central Nine's legitimate performance expectations removes the indirect method from his arsenal. The only remaining issue, then, is whether he can show a causal connection between his request for accommodation and any adverse employment action. *See id.*

The record reveals that Mr. Sickels requested the following forms of accommodation for his disability: a wheelchair, a parking space closer to his classroom, and time out of school to attend rehabilitation sessions after his coronary artery disease episode.[12] He has admitted that each time he made such a request, Central Nine

---

[12]To the extent that Mr. Sickels may dispute the school's obligation to provide him with an instructional assistant after his first assistant left, we note that he did not actually make such a request. "[A] plaintiff must normally request an accommodation before liability under the ADA attaches." *Jovanovic v. In-Sink-Erator Div. of Emerson Elec. Co.*, 201 F.3d 894, 899 (7th Cir.

(continued...)

complied. However, instead of presenting evidence that Central Nine terminated him *because of* his requests for accommodations, he vaguely cites "a clear, unbroken causal chain between his [request], the discipline, the negative comments about his (alleged) failure to move around the classroom, and the termination of his employment." Pl.'s Resp. at 31. His argument is rife with speculation, reliance on suspicious timing, and woefully unsupported assertions. Thus, in light of Central Nine's robust evidence that it fired Mr. Sickels solely based on his demonstrated poor judgment and teaching, we need not examine whether this is one of those rare cases where suspicious timing alone may create a triable issue. We therefore GRANT Central Nine's motion for summary judgment as to Mr. Sickels's ADA claim as well.

## **Conclusion**

For the reasons set forth above, Defendant's Motion for Summary Judgment is GRANTED with respect to all of Plaintiff's claims.

IT IS SO ORDERED.

Date: _____01/27/2012_____

_Sarah Evans Barker_
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

---

[12](...continued)
2000).

Copies to:

Rosemary L. Borek
STEPHENSON MOROW & SEMLER
rborek@stephlaw.com

Michael L. Schultz
PARR RICHEY OBREMSKEY FRANDSEN & PATTERSON LLP
mschultz@parrlaw.com

James S. Stephenson
STEPHENSON MOROW & SEMLER
jstephenson@stephlaw.com